1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE NCAA I-A WALK-ON FOOTBALL
PLAYERS LITIGATION

CASE NO. C04-1254C

ORDER

I.      INTRODUCTION

        This matter comes before the Court on the Plaintiffs' Motion for Class Certification

(Dkt. No. 73), Defendant's Opposition (Dkt. No. 78), and Plaintiffs' Reply (Dkt. No. 101).  Having

considered the papers submitted by the parties and finding oral argument unnecessary, the Court

DENIES Plaintiffs' motion, as follows.

II.     BACKGROUND

        Plaintiffs in this action—Nicholas Pilipauskis, Gary Daniels, Derek DuBois, Dennis DuBois, and

Michael Whitesel[1]—are walk-on football players who played at NCAA Division I-A schools and who

seek to have themselves designated as representatives of a class of similarly situated football players in

---

[1] Claims by additional Plaintiffs Andy Carroll and Brad Ledbetter were dismissed on January 9,
2006 by order of this Court, pursuant to a stipulation of the parties.  (Order (Dkt. No. 77).)

ORDER – 1

1    this antitrust suit against Defendant the National Collegiate Athletic Association ("NCAA").  The NCAA

2    is a voluntary, nonprofit, standard-setting association that promulgates the rules of competition for and

3    operates annual national championships in 22 sports across three divisions.  Over 1,200 educational

4    institutions, athletics conferences, and related organizations are members of the NCAA.  The NCAA

5    regulates intercollegiate athletics in a number of ways, including prescribing rules of play, defining the

6    length of seasons, imposing recruiting constraints, maintaining athletics records, defining eligibility

7    parameters for players, delineating allowable coaching structures, and imposing sanctions when its rules

8    are broken.  The NCAA and its members believe that the NCAA "helps preserve amateurism and, by

9    preventing schools with more prominent football programs from hoarding top players, also promotes

10   competitive balance and fosters competition."  (Def.'s Opp'n 1.)

11          At issue in this lawsuit is NCAA Bylaw 15.5.5, which imposes annual limits on the number of

12   football scholarships that a member school may award.  For Division I-A Football, an institution is limited

13   to 85 "counters"[2] per year.  Plaintiffs allege that they and the class they seek to represent would have

14   received full grant-in-aid ("GIA")[3] scholarships but for the Bylaw 15.5.5 restriction imposed on the

15   number of GIA awards given to football team roster[4] members.  Plaintiffs cast Bylaw 15.5.5 as an

16   anticompetitive agreement between Division I-A members whose purpose is to contain the costs of

17

18          [2] A "counter" is "an individual who is receiving institutional financial aid that is countable against
19   the aid limitations in a sport."  NCAA, 2003–04 NCAA DIVISION I MANUAL, Bylaw 15.02.3 (2003)
     [hereinafter NCAA MANUAL].

20          [3] "Grants-in-aid" apply toward the "cost of attendance," which the NCAA defines as the "total
21   cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related
     to attendance at the institution."  NCAA MANUAL, Bylaw 15.02.2.  However, a "full grant-in-aid" is
22   limited to "tuition and fees, room and board, and required course-related books."  *Id.* Bylaw 15.02.5.
     Student athletes may not receive financial aid that exceeds the value of a full grant-in-aid.  *Id.* Bylaw
23   15.1.

24          [4] The "roster," as used herein, refers to the list of "squad members" on the "first day of
     competition."  NCAA MANUAL, Bylaw 15.5.9.2.  The roster includes both scholarship and non-
25   scholarship players.

26   ORDER – 2

operating their 117 "big time college football" programs.  Plaintiffs allege that the NCAA operates as a classic cartel, joining its competitor-members together to exert monopsony power that restricts competition for one of the major inputs (football players) to the relevant market (Division I-A college football).  Accordingly, Plaintiffs argue that the scholarship limit is an unlawful horizontal restraint of trade imposed by the NCAA and its coconspirators in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, and that the NCAA and its members have conspired to monopolize the "big time college football market."  (Am. Compl.)  Plaintiffs allege that "walk-ons"[5] are injured by the cost-containment practice embodied by Bylaw 15.5.5 and that the subset of walk-ons that they seek to represent can prove this antitrust injury on a classwide basis.

This action commenced on May 19, 2004.  Plaintiffs seek injunctive relief invalidating Bylaw 15.5.5 (or any similar GIA maximum), as well as money damages (to be trebled according to statute), costs, and fees.  This Court denied the NCAA's Rule 12(c) motion for judgment on the pleadings on September 14, 2005, finding (1) that Plaintiffs had sufficiently alleged that the scholarship limit implicates the Sherman Act in a way that eligibility rules do not, (2) that Plaintiffs are entitled to the opportunity to prove that there is a relevant market to which a rule-of-reason analysis can be applied, (3) that Plaintiffs had sufficiently alleged injury to competition, and (4) that Plaintiffs should have the opportunity to demonstrate that the NCAA has monopoly power over the alleged market.  (Order (Dkt. No. 58).)  After significant delay in briefing and discovery on the issue, the Court now takes up the question of whether Plaintiffs may proceed as representatives of a class.

//

//

//

---

[5]  As "walk-ons," Plaintiffs may have been recruited or unrecruited, but they have in common that they did not initially receive a GIA award.  (*See* Am. Compl. (Dkt. No. 17) 6.)  A walk-on may later be awarded a GIA, which then counts toward the school's 85-GIA limit.

ORDER – 3

1

### III.    PROPOSED CLASS DEFINITION

2       Plaintiffs seek to certify the following class:  "all students who during the period starting four

3 years from [*sic*][6] the filing of the complaint were on the football pre-season practice rosters of NCAA

4 Division I-A schools, but who did not receive a full grant-in-aid from their school."  (Pls.' Mot. 1.)  This

5 class would not include all Division I-A walk-on football players.  Rather, Plaintiffs intend this class to

6 cover the *subset* of Division I-A walk-ons who practiced with the scholarship players in pre-season

7 practice (or who counted as one of the 105 players allowed to attend such practice by NCAA rules).  The

8 Court describes this subset of walk-ons in more detail as follows.

9       According to Plaintiffs, there is no limit on roster size during the season, but the average roster

10 size is 115.  (Pl.'s Mot., Tollison Decl. ¶ 20.)  Because of the scholarship limit (85), the roster members

11 who are not on scholarship must participate with the team as walk-ons.  Thus, a hypothetical team with

12 85 scholarship players on a roster of 115 total players will have 30 non-scholarship walk-ons.[7]  However,

13 not all walk-ons at Division I-A schools can attend pre-season practice.  The NCAA imposes a limit on

14 pre-season practice participation at 105 players per team.  NCAA MANUAL, Bylaw 17.11.2.1.1 ("In

15 Division I-A football, there shall be a limit of 105 student-athletes who may engage in practice activities

16 prior to the institution's first day of classes or the institution's first contest, whichever occurs earlier.")

17 Accordingly, the same hypothetical team described above would only be able to have 20 of its 30 walk-

18 ons attend pre-season practice if it is to adhere to the pre-season practice limitation.  It is these roughly

19

20      [6] Taken literally, this wording would mean that a class period of four years would *start* in 2008 (4

21 years from 2004).  However, it is clear that the parties contemplate a four-year statute of limitations boundary on the class that *ended* in 2004 and includes players who participated in football seasons

22 corresponding with academic years 2000–01, 2001–02, 2002–03, and 2003–04.  (*See* Am. Compl. 7–9 (discussing the named Plaintiffs' season involvement as walk-ons); Def.'s Opp'n, Ordover Decl. ¶ 9 n.4

23 ("I understand that the 'class period' is the four academic years from 2000–01 through 2003–04.").)

24      [7] The Court acknowledges that some players may receive scholarships but, due to circumstances such as injuries, etc., still do not "count" toward their school's limit of 85.  For the sake of this brief

25 discussion, the Court assumes that everyone with a scholarship "counts" and attends pre-season practice.

26   ORDER – 4

1   20 walk-ons who *did* attend pre-season practice at each Division I-A school for the 2000–04 seasons that

2   would be members of Plaintiffs' purported class.  Plaintiffs have dubbed these the "top-20 walk-ons."

3   (Pl.'s Mot. 6.)  However, it is not the number (20), but rather the status (pre-season practice attendance)

4   that would define class membership, because, due to factors that change a given school's scholarship

5   number (*e.g.*, a sanction that limits a school to awarding 84 scholarships in a particular year) or the

6   number of pre-season practice attendees (which could be less than 105), there may have been slightly

7   more or fewer walk-ons than 20 attending pre-season practice at a given school for a given season.  The

8   important criterion for class membership, therefore, is that a walk-on was one of the 105 or fewer players

9   allowed by NCAA rules to attend Division I-A pre-season practices for the 2000–04 football seasons.

10  **IV.    CLASS CERTIFICATION STANDARD**

11       Federal Rule of Civil Procedure 23 governs class certification.  To maintain a lawsuit as a class

12  action, each of the four Rule 23(a) requirements, plus *one* of the three Rule 23(b) requirements must be

13  satisfied.  FED. R. CIV. P. 23.  Here, Plaintiffs seek certification under Rule 23(b)(3).  Plaintiffs therefore

14  have the burden to show that their proposed class meets the requirements of Rules 23(a) and (b)(3).

15  *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th

16  Cir. 2001); *see also In re Coordinated Pretrial Proceedings in Petroleum Antitrust Litig.*, 691 F.2d

17  1335, 1343 (9th Cir. 1982).

18       This Court may certify a class only if it is "satisfied, after a rigorous analysis," that the Rule 23

19  prerequisites for class certification are met.  *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147,

20  161 (1982).  However, district courts have broad discretion to determine whether to certify a class within

21  this framework.  *Id.*  In addition, because this is an antitrust case, application of Rule 23's standards must

22  be guided by the general standards of inquiry for class actions, as well as the particular considerations

23  relevant to antitrust cases.  Among these is the principle that antitrust cases are "well suited for class

24  actions."  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 238 (E.D.N.Y. 1998).  This suitability

25  follows from the "important role that class actions play in the private enforcement of antitrust actions."

26  ORDER – 5

1   *Id.* at 239.  Nevertheless, class certification in antitrust cases ultimately depends on satisfaction of Rule

2   23's requirements, as in any other context.

3       Courts may not consider the merits of a case when deciding the question of class certification.

4   *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) ("We find nothing in either the language or

5   history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a

6   suit in order to determine whether it may be maintained as a class action.").  However, "the class

7   determination generally involves considerations that are enmeshed in the factual and legal issues

8   comprising the plaintiff's cause of action."  *Falcon*, 457 U.S. at 160 (internal quotations omitted).  While

9   the substantive allegations of the complaint must be taken as true at the class certification stage, *Blackie*

10   *v. Barrack*, 524 F.2d 891, 901 & n.17 (9th Cir. 1975); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 688

11   (D. Minn. 1995) (antitrust context), "sometimes it may be necessary for the court to probe behind the

12   pleadings" to "determine whether the interests of the absent parties are fairly encompassed within the

13   named plaintiff's claim."  *Falcon*, 457 U.S. at 160.  As the First Circuit has noted, "a district court must

14   formulate some prediction as to how specific issues will play out in order to determine whether common

15   or individual issues predominate in a given case."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d

16   288 (1st Cir. 2000) (citing *Falcon*, 457 U.S. at 160–61; *Coopers & Lybrand v. Livesay*, 437 U.S. 463,

17   469 (1978)).

18       Here, the parties have submitted voluminous declarations from experts and others to supply the

19   Court with the material needed to evaluate the factual and legal issues presented by this case in light of

20   the foregoing standards for class certification analysis.  While the Court will consider the expert materials

21   submitted with class certification briefing, it will not "delve into the merits" of the expert opinions or

22   "indulge 'dueling' between" the parties' undisputedly well-qualified[8] experts.  *In re Northwest Airlines*

23

24       [8] Neither side asserts that the opposing expert is unqualified.  Moreover, both Plaintiffs' expert
Dr. Tollison and the NCAA's expert Dr. Ordover appear to have sufficient qualifications.  (Pls.' Mot.,

25   Tollison Decl. Ex. 1 (*curriculum vitae*), Ex. 2 (expert testimony and reports provided in other cases);

26   ORDER – 6

*Corp. Antitrust Litig.*, 208 F.R.D. 174, 218 (E.D. Mich. 2002) (internal citation omitted).  Further, the Court declines the NCAA's invitation (*see* Def.'s Opp'n 6–7) to embark on a full-fledged *Daubert* inquiry or an admissibility determination under the Federal Rules of Evidence at this stage of the litigation.  *See Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004) (citing cases in support of notion that *Daubert* inquiries and exacting expert standards are inappropriate at class certification stage).  Rather, at this point, "the question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met." *Id.* (citing *In re Polypropylene Carpet Antitrust Litigation*, 996 F. Supp. 18, 26 (N.D. Ga. 1997)).  Determining the trial admissibility or the ultimate weight of opposing expert opinions is a far different inquiry than the threshold one appropriate here, where Plaintiffs' expert must only demonstrate that his methodology is not "so fatally flawed as to be inadmissible as a matter of law." *Id.*; *see also In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 76–80 (E.D.N.Y. 2000) (limited evaluation of expert testimony on class certification). Accordingly, the Court will address expert issues where appropriate, but will do so on a limited basis.

Having set forth the applicable standards for class certification analysis, the Court now turns to the requirements of Rules 23(a) and (b)(3).

## V.  RULE 23 ANALYSIS

### A.  Rule 23(a)

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so *numerous* that joinder of all members is impracticable ["numerosity"], (2) there are question of law or fact *common* to the class ["commonality"], (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class ["typicality"], and (4) the *representative* parties will *fairly and adequately* protect the interests of the class ["adequate representation"].

---

Def.'s Opp'n, Ordover Decl. Ex. 1 (*curriculum vitae*), Ex. 2 (expert testimony provided in other cases).)

1  FED. R. CIV. P. 23(a) (emphasis added).  The Court must address numerosity, commonality, typicality,

2  and adequate representation separately in assessing whether Plaintiffs have met their Rule 23(a) burden.

3              1.      **Numerosity**

4          Rule 23(a)(1) requires the class to be so numerous that complete joinder of individual class

5  members is impracticable.  The numerosity requirement calls for more than speculation, but less than an

6  exact figure.  ALBA CONTE & HERBERT B. NEWBERG, 6 NEWBERG ON CLASS ACTIONS § 18:2 (4th ed.

7  2002) [hereinafter NEWBERG].  "A finding of numerosity may be supported by common sense

8  assumptions, and it is especially appropriate in antitrust actions brought under Rule 23(b)(3)." *In re*

9  *Playmobil*, 35 F. Supp. 2d at 239 (citing NEWBERG (2d ed. 1985)).  Geographic dispersion also plays a

10 role in determining whether joinder would be impracticable.  *Id.*

11         Here, the purported class includes walk-on football players from all over the United States.

12 Plaintiffs assert that there are "hundreds, if not thousands" of members of the proposed class.  (Pl.'s Mot.

13 11.)  The NCAA does not dispute Plaintiffs' allegation as to the size of the class, nor does it challenge

14 class certification on the basis of failure to meet the numerosity requirement.  Further, given an average

15 roster size of approximately 115 during the 2000–04 seasons,[9] along with the NCAA-imposed limit of

16 105 players who can attend pre-season practice, it is reasonable to estimate that there were roughly 20

17 walk-ons who attended pre-season practice per season at many, if not all, of the 117 Division I-A

18 schools.  Thus, for *one* of the four seasons at issue here, the Court can reasonably estimate that *at least*

19 2,000 players probably would be class members, and a class of over 2,000 people nationwide certainly

20 satisfies the numerosity requirement.  *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 477 (W.D.

21 Pa. 1999); *Lewis v. National Football League*, 146 F.R.D. 5, 8–9 (D. D.C. 1992).  Accordingly, the

22 Court finds that Rule 23(a)(1) is satisfied in this case.

23

24         [9] It is undisputed that the average roster size during the seasons at issue in this lawsuit (2000–04)
   was at least 115.  (Pl.'s Mot., Tollison Decl. ¶ 41 tbl.4 (showing data from the NCAA's website about
25 roster sizes).)

26 ORDER – 8

1

### 2.    Commonality

2    Rule 23(a)(2) requires that there be questions of law or fact common to the class.  However, *not*

3  *all* questions of law and fact need to be common to the class.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

4  1019 (9th Cir. 1998); Newberg § 18:5.  Further, "individual issues of fact will invariably be present,"

5  and this reality will not preclude certification.  Newberg § 18:6, at 21.  As the Ninth Circuit has

6  explained the test, "[t]he commonality preconditions of Rule 23(a)(2) are less rigorous than the

7  companion requirements of Rule 23(b)(3) [that common issues predominate over individual ones].

8  Indeed, Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with

9  divergent factual predicates is sufficient . . . ."  *Hanlon*, 150 F.3d at 1019.

10    Moreover, in the antitrust context, the existence of a conspiracy, its scope, its effect, whether it

11  violates the Sherman Act, and whether it should be enjoined are standard "common questions."  *See, e.g.*,

12  *In re Flat Glass*, 191 F.R.D. at 478–79; *Northwestern Fruit Co. v. A. Levy & J. Zenter Co.*, 116 F.R.D.

13  384 (E.D. Cal. 1986).  In addition to conspiracy issues, allegations of price-fixing and monopolization are

14  considered to be "common questions" as well.  Newberg § 18:5.  As one district court has noted,

15  "[a]ntitrust price-fixing conspiracy cases, by their nature, deal with common legal and factual questions

16  about the existence, scope and effect of the alleged conspiracy."  *Cumberland Farms, Inc. v.*

17  *Browning–Ferris Indus. Inc.*, 120 F.R.D. 642, 646 (E.D. Pa. 1988).

18    The NCAA does not dispute that Plaintiffs have passed the Rule 23(a)(2) commonality test.

19  Rather than dispute commonality, the NCAA contends that individual issues predominate over common

20  ones, under Rule 23(b)(3), as discussed *infra*.  Because commonality is not disputed and because the

21  nature of this antitrust lawsuit makes it clear that common issues exist, the Court finds the commonality

22  requirement satisfied in this case.  By way of example, but not limitation, the Court notes that common

23  issues here include: whether Bylaw 15.5.5 is a horizontal restraint of trade in violation of the Sherman

24  Act; whether there is a relevant market for antitrust purposes; whether the NCAA and its members have

25  //

26  ORDER – 9

1  improperly monopolized Division I-A college football; whether there has been injury to competition; and

2  whether an injunction and/or damages are appropriate remedies for the alleged illegal conduct.

3              **3.    Typicality**

4       Rule 23(a)(3) requires that the class representatives have claims or defenses typical of the class.

5  Typicality is present if a plaintiff's claim "arises from the same event or practice or course of conduct that

6  gives rise to the claims of other class members, and her or his claims are based on the same legal theory."

7  NEWBERG § 18:8, at 26.

8           The main principle behind typicality is that the plaintiff will advance the interests of the
            class members by advancing her or his own self-interest.  The alignment of interest is not
9           the test for typicality.  It is the result. . . .  The plaintiff whose claim is typical will
            ordinarily establish the defendants' liability to the entire class by proving his or her
10          individual claim.

11  *Id.* at 29; *see also Hanlon*, 150 F.3d at 1020 ("Under the rule's permissive standards, representative

12  claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not

13  be substantially identical."); *In re Playmobil*, 35 F. Supp. 2d at 242 (typicality discussion); *State of Minn.*

14  *v. U.S. Steel Corp.*, 44 F.R.D. 559, 566–67 (D. Minn. 1968) (finding that disparity of proof of damages

15  will not render claims atypical).

16       The NCAA's cursory objection to typicality (Def.'s Opp'n 23–24) is meritless.  Not only does it

17  miss the mark by confounding typicality of claims and typicality of parties,[10] but it also unpersuasively

18  raises a question of standing that is improperly framed as a class-certification issue, as discussed *infra*

19  subsection V.A.4, note 12.

20       Here, the legal theory to be advanced by all class members—that the NCAA and its members

21  violated the Sherman Act—is identical.  The facts going to the violation are also identical for each class

22  member.  *All* of the factual and legal inquiries will be the same to establish the relevant market, illegality,

23  characterization of Bylaw 15.5.5 as a horizontal restraint, injury to competition, and the propriety of an

24

25       [10] *See Martino v. McDonald's System, Inc.*, 81 F.R.D. 81, 85 (N.D. Ill. 1979) ("Rule 23(a)(3)
    requires that the representative parties' claims be typical, not that the parties themselves be typical.").

26  ORDER – 10

1   injunction.  Where the required proof diverges significantly is at the antitrust injury and damages stages,

2   as discussed *infra* subsection V.B.  However, because proof of an antitrust violation by the

3   representatives would establish an antitrust violation as to the rest of the class as well, and, in turn, give

4   rise to *potential* NCAA liability to the members of the class, and because "alignment of interest" is not

5   required for a typicality finding, the Court finds that the typicality requirement is met notwithstanding

6   divergent injury and damages issues.

7                      **4.     Adequate Representation**

8          Rule 23(a)(4) requires that the class representatives will be able to fairly and adequately protect

9   the interests of the class.  This requirement's purpose is to ensure that absent class members are "afforded

10  adequate representation before entry of a judgment which binds them."  *Hanlon*, 150 F.3d at 1020.  As

11  noted by the Second Circuit,

12          an essential concomitant of adequate representation is that the party's attorney be
            qualified, experienced and generally able to conduct the proposed litigation.  Additionally,
13          it is necessary to eliminate so far as possible the likelihood that the litigants are involved in
            a collusive suit or that plaintiff has interests antagonistic to those of the remainder of the
14          class.

15  *Eisen v. Carlisle and Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968).  Thus, two inquiries are required to

16  determine whether representation will be fair and adequate.  The first is whether the named plaintiffs and

17  their counsel have any conflicts of interest with other class members; the second is whether the named

18  plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  *Hanlon*,

19  150 F.3d at 1020.

20         The NCAA does not challenge the representation by Plaintiffs' counsel—lead representation by

21  the law firm of Hagens Berman Sobol Shapiro LLP, with Steve Berman as lead counsel for Plaintiffs and

22  the proposed class.  Further, the firm and lead counsel clearly are experienced and capable of providing

23  vigorous and competent representation in this antitrust class action suit.

24         While it does not object to Plaintiffs' counsel, the NCAA does cast doubt on the named Plaintiffs'

25  ability to adequately represent the class by emphasizing competition *between* class members and by

26  ORDER – 11

1   asserting that factual unknowns make it difficult, if not impossible to tell "which, if any, of [the walk-ons]

2   would have" actually been awarded scholarships without the Bylaw 15.5.5 limit—thus questioning their

3   relationship to the NCAA as injured parties.  (Def.'s Opp'n 23.)  The NCAA asserts, for example, the

4   following requirements of Plaintiffs' proof of injury and damages: (1) that exact numbers be determined

5   for each school's scholarship offerings in a "but for" world with no caps; (2) that each player be able to

6   prove that, given this (allegedly undeterminable) number, he (and not other teammates) actually would

7   have been awarded one of those scholarships; (3) that players from other schools would not have been

8   preferred over him for one his school's scholarships; and (4) that in the "but for" world, he would have

9   attended the same school that he actually attended (or, alternatively, if he would have attended a different

10  school, which school that would have been).  The NCAA argues that all of these questions and more

11  must be answered for *each* class member before injury and damages can be determined.

12      Where a conflict exists between class members who allege an *absence of dealing*, such as the lack

13  of scholarships offered here, the conflict may preclude certification if it goes to the merits of the litigation.

14  NEWBERG § 18:17.  To preclude certification, such a conflict must be "overriding."  *Id.* at 58 (internal

15  quotation omitted).  Further, where "claims involve 'amounts of business *not done* and without the

16  slightest objective guidelines for apportioning individual damages among the class members,' this creates

17  a conflict of interest as to an essential element of [] antitrust claims."  *Christiana Mortgage Corp. v.*

18  *Delaware Mortgage Bankers*, 136 F.R.D. 372, 380 (D. Del. 1991) (quoting *Al Barnett & Son, Inc. v.*

19  *Outbound Marine Corp.*, 64 F.R.D. 43, 50 (D. Del. 1974)); *see also Glictronix Corp. v. Am. Tel. & Tel.*

20  *Co.*, 603 F. Supp. 552, 585–86 (D. N.J. 1984); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D.

21  541, 544 (E.D. Pa. 1976).

22      While antitrust injury and damages issues are discussed in more detail *infra* subsection V.B., the

23  Court specifically notes the following for purposes of this adequate representation discussion.  Plaintiffs'

24  expert clearly suggests that injury and damages can be proven on a classwide basis and that conflicts

25  between class members about their individual damages will be largely irrelevant to these stages of proof.

26  ORDER – 12

Plaintiffs further argue that there may be no need to ever determine individual damages to the level of certainty that the NCAA suggests. For instance, Plaintiffs' expert has proposed a general method by which to prove that a particular number of scholarships would be offered in the "but for" world and that each class member was injured, as well as a damages calculation formula that involves the number of years that an individual was a walk-on player, the value of a scholarship at his school during the years he was a walk-on, and the number of class members. (*See* Pls.' Mot., Tollison Decl. 39–40 (damages formula).) However, even assuming for purposes of this discussion that these methods are permissible means of proving some level of classwide impact and classwide damages, they fail to account for the complex individual questions that will remain before this litigation can be concluded. Once a lump sum of classwide damages is calculated, this money must be distributed in some manner. Plaintiffs' expert offers no explanation about how each class member's *actual* damages will be determined after a generalized calculation is made. It is these specific calculations—along with the inseparable proof of causation—that present significant individual issues for each class member, as discussed *infra* subsection V.B, as well as provide evidence of fundamental intra-class conflicts.

The Court emphasizes that in considering the adequate representation element, the question is not *whether* individual damages need to be calculated. Rather, assuming that the mere need to calculate individual damages does not preclude certification, *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977), the question here is the *means* that will be required to make such individual damages calculations. In order to prove that he is entitled to a particular piece of the damages pie, each class member will have to offer proof that necessarily will involve arguing that a threshold number of other players (class members and non-class members) would *not* have gotten that same scholarship money. In a similar "failure-to-do-business" case, another district court found that

> each of the potential class members is a competitor in the sense that each operates in the same relevant market and each competes for the fixed amount of business which this market generates. An illegal foreclosure of this limited market will necessarily generate a limited amount of damages. Since the named plaintiffs and the class members are competitors for this business, they will necessarily compete for the limited damages

ORDER – 13

1   attributable to illegal foreclosure in the market.  Plaintiffs' attempt to maximize their own
2   damage recovery will conflict with the interests of the class because maximization of
    plaintiffs' damages will limit the amount of damages left for the class members to share.

3   *Chestnut*, 72 F.R.D. at 545.  Assuming that Plaintiffs can establish the relevant market, that it was
4   illegally constrained by an antitrust violation, and that some antitrust injury ensued, the damages
5   conundrum described in *Chestnut* will be central to resolution of the instant case as well.  If, for example,
6   the players can prove that each school would have awarded 20 additional scholarships, they then will
7   have to prove *who* would have received those scholarships—and for each to prove that *he* would have
8   been in that group, he will have to prove that others were not.  Therefore, *even if* the Court accepts the
9   sufficiency of Plaintiffs' expert's proposed method of establishing classwide antitrust injury and classwide
10  damages,[11] the Court finds that "no method at all" has been presented by Plaintiffs' expert to deal with
11  the problem of intra-class antagonism at the damages calculation and distribution phase.

12      The purported class members in this failure-to-award-scholarships case have inherently conflicting
13  interests.  Accordingly, the representatives cannot adequately represent all members of the class.  Class
14  representatives and members indeed will have to "undercut" other class members' interests in order to
15  proceed with this litigation.  Because of this intra-class conflict, the Rule 23(a)(4) requirement of
16  "adequate representation" cannot be met in this case.[12]

---

17      [11] *See infra* subsection V.B for further discussion of whether such classwide proof is sufficient.

18
19      [12]  The NCAA's final challenge to adequacy of representation—that the named plaintiffs are "not
    typical of, or even in, the class" (Def.'s Opp'n 23)—does not raise an appropriate class certification
20  inquiry.  Rather, it goes to standing.  The U.S. Supreme Court "has held that standing is not a class issue,
    but a requirement that must be met by every plaintiff, whether the suit is brought individually or on behalf
21  of a class."  NEWBERG § 18:15, at 48 n.2 (citing *Laird v. Tatum*, 408 U.S. 1 (1972), and noting that the
    "so-called membership in the class requirement" is "in reality . . . a conclusion, not an independent class
22  representative test, that the plaintiff has standing and that the plaintiff's claims are typical.").
        The NCAA has not claimed that the Plaintiffs lack standing to sue the NCAA regarding
23  Bylaw 15.5.5.  Rather, the NCAA attempts to add to the class definition requirements that walk-ons were
    "carefully recruited" and that they were "most likely to play in actual games," specifically by noting that
24  Nicholas Pilipauskis was "not recruited, carefully or at all" and that Dennis DuBois and Michael Whitesel
    never played in any games.  (Def.'s Opp'n 24.)  These characteristics are not part of the proposed class
25  definition, and these Plaintiffs' capacity to represent the class cannot be challenged on these bases.  The

26  ORDER – 14

1    **B.     Rule 23(b)**

2        While finding that Plaintiffs have failed to satisfy Rule 23(a)(4) is sufficient to deny class

3    certification, the Court must conduct a "searching inquiry" under Rule 23, and therefore will test

4    Plaintiffs' proposed class under Rule 23(b)(3) as well.  Rule 23(b) provides:

5        An action may be maintained as a class action if the prerequisites of subdivision (a) are
         satisfied, and in addition:

6            . . . .
             (3) the court finds that the questions of law or fact common to the members of the
7        class *predominate* over any questions affecting only individual members
         ["predominance"], and that a class action is *superior* to other available methods for the
8        fair and efficient adjudication of the controversy ["superiority"].  The matters pertinent to
         the findings include: (A) the interest of members of the class in individually controlling the
9        prosecution or defense of separate actions; (B) the extent and nature of any litigation
         concerning the controversy already commenced by or against members of the class; (C)
10       the desirability or undesirability of concentrating the litigation of the claims in the
         particular forum; (D) the difficulties likely to be encountered in the management of a class
11       action.

12   FED. R. CIV. P. 23(a) (emphasis added).

13       **1.     Predominance of Common Questions of Law and Fact**

14       The Rule 23(b)(3) "predominance" inquiry differs from the "commonality" inquiry of Rule

15   23(a)(2).  The Rule 23(b)(3) analysis "presumes that the existence of common issues of fact or law have

16   been established pursuant to Rule 23(a)(2)," and instead "focuses on the relationship between the

17   common and individual issues."  *Hanlon*, 150 F.3d at 1022.  In the antitrust context, "issues of

18   conspiracy, monopolization, and conspiracy to monopolize have been viewed as central issues which

19   satisfy the predominance requirement."  NEWBERG § 18:26, at 86–89.  Further, "individual damage

20   questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class."

21   *Id.* § 18:27, at 91.  While antitrust cases commonly satisfy the predominance test, a "mere allegation of

22

23   ─────────────────────

24   only seemingly legitimate challenge to the representative Plaintiffs' "class membership" is that to Dennis
     DuBois, because he allegedly never participated in pre-season practice at any school.  (*See* Def.'s Opp'n,
     Wheeler Decl. Ex. F (Dep. of Dennis DuBois 56–57, 89).)  This, however, is not a class certification
25   issue and has no impact on the named Plaintiffs' ability to adequately represent the purported class.

26   ORDER – 15

1   price-fixing will not satisfy" Rule 23(b)(3). *In re Potash*, 159 F.R.D. at 693. Thus, in considering Rule

2   23(b)(3), the Court must look to the claims Plaintiffs seek to litigate in the factual context of the case and

3   determine whether the elements of Plaintiffs' claims lend themselves to common proof. *Id.* at 693–94;

4   *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y 1996)

5   (describing plaintiffs' burden on class certification with respect to elements of antitrust liability).

6   Obtaining a remedy for the price-fixing conspiracy that Plaintiffs allege requires proving (1) a violation of

7   the Sherman Act, (2) the "fact of damage," and (3) the amount of damages. *Id.*; *see also Bogosian*, 561

8   F.2d at 545–56; *Chestnut*, 72 F.R.D. at 547–48.

9          In the instant case, the first element of Plaintiffs' antitrust claim involves not only proving the

10  existence of NCAA Rule 15.5.5, but also whether it violates the Sherman Act. The NCAA argues that

11  because it does not dispute the existence of the scholarship cap, the existence of a conspiracy is a

12  nonissue, and therefore cannot be a common issue that could predominate. The Court disagrees. The

13  existence of the scholarship cap is not *all* that Plaintiffs must prove to establish a violation of the Sherman

14  Act. Indeed, this Court has already ruled that a "rule-of-reason" analysis will be required to determine

15  whether Bylaw 15.5.5 violates antitrust law. *In re NCAA I-A Walk-On Football Players Litig.*, 398 F.

16  Supp. 2d 1144, 1150 (W.D. Wash. 2005). The Court agrees with Plaintiffs (*see* Pl.'s Reply 4) that the

17  application of the rule-of-reason analysis creates additional common issues, and that the NCAA's

18  assertion to the contrary is untenable. In addition, the parties' dispute about whether this case involves

19  true "price-fixing" (*see* Def.'s Opp'n 7–9; Pls.' Reply 3–5) is a common issue that cannot be ignored

20  simply because the NCAA agrees that Bylaw 15.5.5 exists.

21         Thus, the Court finds that, as to the *first* element of Plaintiffs' antitrust claim, there are multiple

22  common issues to be resolved. These common issues include the legal questions discussed here, as well

23  as whether Bylaw 15.5.5 is an illegal horizontal restraint of trade, whether there is a "relevant market,"

24  and whether there was an improper monopolization of Division I-A college football. Further, there is no

25  //

26  ORDER – 16

1   question that such common issues "predominate" as to the existence of an *antitrust violation*—indeed, no

2   individual issues have even been identified as to this element.

3        However, once the existence of an antitrust violation has been fully litigated, the predominance of

4   common issues will fade quickly.  In this case, predominance of common issues as to one element of

5   Plaintiffs' claim is insufficient for a finding of predominance of common issues as to the entire litigation.

6   The individualized determinations that will be required to prove antitrust injury and damages provide an

7   insurmountable barrier to class treatment, as follows.

8        If an antitrust violation is established, the second and third elements of Plaintiffs' claim relate to

9   the fact and amount of damages caused by that violation—issues that will involve almost entirely

10  individual determinations on the facts of this case.  While these elements both go to Plaintiffs' injuries,

11  they remain separate inquiries.  The second element—"fact of damage" or "antitrust injury"—"flows from

12  that which makes defendants' acts unlawful." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484

13  (1982).  Proof of such impact can be "made on a common basis so long as the common proof adequately

14  demonstrates some damage to *each individual*." *Bogosian*, 561 F.2d at 454 (emphasis added).  Antitrust

15  "[i]mpact is a distinct element of liability, independent of proof of a violation and independent of the

16  matter of individual damages." *Glictronix*, 603 F. Supp. at 588.  Thus, liability cannot be established

17  until this second element is proven.

18       Upon showing that some degree of damage was sustained by each plaintiff under the "fact of

19  damage" test, Plaintiffs must then prove and measure their damages to satisfy the third element.  *See*

20  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).  However, in a Rule

21  23(b)(3) analysis, the contours of the third element require the least scrutiny.  *See In re Potash*, 159

22  F.R.D. at 694 ("[T]he issue in the common impact analysis is the fact, not the amount, of injury.").

23  Moreover, once antitrust injury is established (*i.e.*, liability attaches), the overall burden of proving

24  damages is reduced in antitrust cases.  *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir.

25  1982) ("A study of the adjudicated cases in [the antitrust] area readily dispels any impression that [the]

26  ORDER – 17

1   question of damages is governed by an application of the common law rule of reasonable certainty.  The

2   cases have long since departed from this rule in antitrust litigation.").

3      Here, the NCAA puts most of its emphasis in opposing class certification on the argument that

4   individual issues predominate as to injury and damages.  (Def.'s Opp'n 9–23.)  The NCAA argues that

5   the Court must (impermissibly) accept "four 'key' assumptions" made by Plaintiffs' expert in order to find

6   common impact.  (*Id.* at 9.)  These "assumptions" are defined by the NCAA as the following: (1) Bylaw

7   15.5.5 actually limited the number of scholarships at all 117 Division I-A schools during the class period

8   because they all awarded 85 scholarships each year; (2) all schools would add 20 scholarships if Bylaw

9   15.5.5 did not exist; (3) each member of the class would have received one of those scholarships; and (4)

10  each member would have attended the same school even without the Bylaw 15.5.5 restrictions.  (*Id.*)  As

11  discussed below, the Court finds "assumptions" (1) and (2) to be insignificant, given Plaintiffs' proposed

12  method of proof, but the Court finds that "assumptions" (3) and (4) cannot be resolved without

13  significant individual inquiry going far beyond Plaintiffs' suggested method of generalized proof.  The

14  Court will utilize the NCAA's four groupings, as outlined here, in discussing the questions they raise

15  regarding predominance.

16     Plaintiffs and their expert maintain that questions (1), (2), and (3) may be proven by data analysis

17  modeling what a "but for" world would look like without the scholarship cap.  A fundamental difference

18  between Plaintiffs' expert and the NCAA's expert is how they frame such a model.  Plaintiffs argue that

19  the proper frame of reference involves comparing current practices to pre-restraint practices, which in

20  turn will prove that antitrust impact resulted from Bylaw 15.5.5.   In contrast, the NCAA argues that

21  there is no way—if the restraint were lifted tomorrow—that all 117 schools would offer 20 more

22  scholarships because they do not all offer 85 today.  Plaintiffs answer the NCAA's criticism of their

23  expert methodology by emphasizing that practices in a restrained world should *not* inform construction of

24  any useful "but-for" model of an unrestrained world.  As noted *supra*, this Court will not engage in a

25  battle of the experts or a detailed back-and-forth between the expert declarations submitted on this

26  ORDER – 18

1    motion.  Nor will it endorse either party's approach.  It is enough for the Court to find that Plaintiffs'

2    proposed method of analyzing pre-restraint data, considering ongoing economic factors, and modeling a

3    "but for" world are sufficient to meet their burden on class certification on the questions of (1) whether

4    Bylaw 15.5.5 actually limited the number of scholarships at all 117 Division I-A schools during the class

5    period and (2) whether all schools would have awarded 20 additional scholarships in the absence of

6    Bylaw 15.5.5.

7           However, accepting Plaintiffs' method as sufficient for class-certification purposes to prove the

8    *number* of scholarships that would have been awarded in a "but for" world does not dispose of questions

9    (3) and (4) about *which players* would have been awarded those scholarships.  Thus, even if "antitrust

10   injury" can be proven to some degree as a general matter (*i.e.*, some players were hurt by Bylaw 15.5.5),

11   antitrust injury *as to each member of the class* (proof of which is required, *see Bogosian*, 561 F.2d at

12   454) cannot be proven without considering the facts surrounding each class member, including whether

13   each one of them would have actually been awarded one of the additional scholarships and which school

14   he would have attended.  Fully proving antitrust injury requires providing answers to highly individualized

15   questions such as these.

16          The NCAA argues that detailed discovery will be necessary to prove antitrust injury (and

17   damages)—such that each and every coach and walk-on at all 117 schools for the 4-year class period

18   will need to be interviewed to determine who would have been awarded scholarships if more were

19   available, which players would have been "traded in" for other "better" players, and which players would

20   have crossed divisions or attended other schools.  The Court does not need to determine whether this is

21   accurate, but finds that a threshold number of individualized inquiries will be required such that individual

22   issues will predominate on the question of antitrust injury, and, therefore, liability.

23          Plaintiffs' presumption that each class member would have been injured is unsupported, even if

24   Plaintiffs are correct about the number of scholarships that would have been available but for Bylaw

25   15.5.5.  Plaintiffs have not offered any method of proving that the purported class members would have

26   ORDER – 19

been *the same* players injured by the restraint.  As with the adequate representation determination, the difficulty here stems from the nature of this case, where Plaintiffs allege *failure* to award scholarships.  The nexus between the number of scholarships available in the "but for" world and the members of the purported class (*i.e.*, matching scholarships with real players) requires individualized proof.  Even if there could be some level of relevant common proof of generalized antitrust injury, the individual issues going to full satisfaction of this critical element of liability clearly predominate.

The NCAA not only challenges Plaintiffs' ability to show classwide antitrust injury, it also alleges that damages calculations will be infeasible, if not impossible.  Plaintiffs dispute the NCAA's claim that individual damages calculations are necessary.  Further, Plaintiffs' expert has presented a formula for figuring damages on a classwide basis, taking into account the number of years that an individual was a walk-on player, the value of a scholarship at his school during the years he was a walk-on, and the number of class members.  (*See* Pls.' Mot., Tollison Decl. 39–40 (damages formula).)  Such an approach is acceptable in antitrust cases generally.  NEWBERG § 18:53.  However, the Court finds such generalized proof of damages unacceptable under the circumstances of this case, where individual issues permeate the determination of *both liability and damages*.

For the reasons set forth *supra* subsection V.A.4, the Court finds that individual issues clearly predominate as to the element of damages.  Specifically, each player must prove that he would have received a scholarship (injury) *and* how much it would have been (damages).  The Court acknowledges that individual damages determinations alone are not enough to prevent class treatment.  However, "damages" cannot be considered in a vacuum.  On the facts of this case, proof of injury likely will provide a foundation for proof of damages for each player.  Thus, rather than being a severable issue, proof of damages is wrapped up in proof of liability itself.  Accordingly, individual damages issues join with individual liability issues to prevent class certification in this case.

Not only is individualized proof required at the damages phase as a practical matter, it is a constitutional requirement as well.  Plaintiffs allege that they "have been injured in their business and

ORDER – 20

1   property," and have requested that the Court award treble damages.  Because Plaintiffs have brought an

2   action at law, they are entitled to the jury trial that they have demanded.  *Beacon Theatres, Inc. v.*

3   *Westover*, 359 U.S. 500, 504 (1959) ("[T]he right to trial by jury applies to treble damage suits under the

4   antitrust laws."); *see also Burnham Chem. Co. v. Borax Consol.*, 170 F.2d 569 (9th Cir. 1948)

5   (complaint for damages alleging violation of Sherman Act was an action at law rather than a suit in

6   equity).  Further, even when legal and equitable claims are joined in the same action, "the right to jury

7   trial on the legal claim, including all issues common to both claims, remains intact." *Curtis v. Loether*,

8   415 U.S. 189, 196 n.11 (1974).  Accordingly, each class member also would be entitled to a jury trial.

9   Indeed, "class action plaintiffs may obtain a jury trial on any legal issues they present." *Ross v. Bernhard*,

10   396 U.S. 531, 541 (1970).  These include issues of causation and damages.  Plaintiffs suggest no way to

11   deal with each purported class member's Seventh Amendment right to have his damages determined by a

12   jury.

13        As discussed *supra* in regard to intra-class conflict, each class member would have an incentive to

14   prove that he would have received a scholarship, while others would not have been awarded the

15   scholarship for which he would have been competing.  Each potential class member would have the right

16   to make such a case to a jury, and, in order to receive damages, each class member would be required to

17   do so, because the prerequisite *antitrust injury* requires individualized proof as well.

18        Finally, Plaintiffs appear to propose that, after injury is established, each player's amount of

19   damages will be simply a function of the price of an education at the school he actually attended.

20   Unanswered is the question of what to do if a class member would prefer to argue to the jury that his

21   damages should be higher because he would have preferred to go to a more expensive school.  Because

22   Plaintiffs have proposed to calculate damages using a generalized damages formula that presumably does

23   *not* account for individual issues such as this, the prospect of decreasing the damages pot due to one

24   individual's jury right presents a host of problems as to every other class member as well.

25   *//*

26   ORDER – 21

Plaintiffs can obtain *no* remedy without proving antitrust injury.  The resolution of individual issues necessary to proving this essential element of liability precludes class treatment.  Likewise, the closely related question of amount of damages requires individualized proof.  While the necessity for individualized damages calculations *alone* normally will not preclude class certification, the facts of this case demonstrate that the issues of antitrust injury and damages will be intertwined to such a degree that individual issues are not simply about damages.  Rather, they go to the heart of the lawsuit.

The test for Rule 23(b)(3) is predominance of common issues.  The Court acknowledges that there are *only* common issues as to whether there is an antitrust violation.  However, the individual issues that are involved in impact and causation determinations and damages calculations overshadow the common issues in this case.  Here, "the predominant question is, not the issue of a violation of the antitrust laws in the abstract, but whether a particular member was damaged and, if so, by how much." *Chestnut*, 72 F.R.D. at 548.  For the foregoing reasons, the Court finds that individual issues predominate over common issues, and that the predominance requirement of Rule 23(b)(3) cannot be satisfied in this case.

### 2.    Superiority of the Class Action Method

The Court finds that class action treatment is inferior, particularly in light of its findings *supra* that individual issues predominate over common ones.  Should Plaintiffs—proceeding as individuals in this case—prevail, Bylaw 15.5.5 will have been found unlawful.  Success in this lawsuit at the liability phase (antitrust violation plus antitrust injury) will set the stage for other plaintiffs (would-be class members or others) to bring separate lawsuits if they choose, so that they may attempt to prove their own antitrust injury and damages.  The Court finds this method—allowing individuals to bring separate suits that will require almost wholly individualized proof—far superior to certifying the instant case as a class action.

Moreover, the recovery for each individual—the cost of an entire college education in some cases—likely *would* be substantial enough to encourage individual plaintiff suits against the NCAA as a practical matter.  Further, attorney's fees are available by statute, and the cost of subsequent litigation

ORDER – 22

would be insubstantial for future plaintiffs, particularly if an antitrust violation is established here. Thus, the twin concerns in antitrust cases of low individual recovery and high litigation costs are not present in this case.

Finally, the Court finds that a class action would be unmanageable. The potential for thousands of complicated jury trials on antitrust injury and damages is great. The Court has duly considered alternatives to denying class certification, such as bifurcation and subsequent decertification, but finds these inferior, particularly in light of the attendant Seventh Amendment implications of using these devices in this case, where individual issues go to liability as well as damages.

For the foregoing reasons, the Court finds that class treatment is inferior and that the superiority requirement of Rule 23(b)(3) cannot be satisfied in this case.

Because Plaintiffs have failed to satisfy all of the requirements of Rules 23(a) and (b)(3), the Court cannot certify a class in this matter.

## VI.     CONCLUSION

For the reasons set in this Order, Plaintiffs' motion for class certification is hereby DENIED.

SO ORDERED this 3rd day of May, 2006.

John C. Coughenour

United States District Judge

ORDER – 23